## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARK CHAPMAN,
     Plaintiff,

     v.

SIKORSKY AIRCRAFT CORPORATION,
     Defendant.

No. 13-cv-00518 (VAB)

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Mark Chapman, filed an amended complaint [Doc. No. 19] against his former employer, Defendant Sikorsky Aircraft Corporation ("Sikorsky"), alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq.*, invasion of privacy, and libel per se.  Defendant has filed a Motion for Summary Judgment [Doc. No. 93].  For the reasons that follow, Defendant's Motion is GRANTED as to Plaintiff's claims arising under federal law.  The Court declines to exercise supplemental jurisdiction over the remaining state law claims and dismisses them without prejudice.

### FACTUAL BACKGROUND

Mark Chapman began working at Sikorsky in February 2007, at the age of 47, as a manager of Technical Training Systems.  56(a) Stmts. ¶ 1.  In or about July 2010, he began reporting to Terry Eichman, who had until that time been reporting to him.  *Id.* ¶¶ 2-3.  During his tenure at Sikorsky, Chapman received exceptional performance or fully competent personnel reviews, most recently in April 2011, and was awarded tens of thousands of dollars in bonuses,

including a performance-based bonus for work he did in 2010.  Chapman Dep. 37, 52; Eichman Dep. 74-75.

Beginning in the summer of 2011, however, when Chapman was 52 years-old, Chapman's supervisor, Eichman, allegedly began making derogatory comments about Chapman and other older employees based on their age.  *See*, *e.g.*, Chapman Dep. 52 ("[Eichman] would look at me . . . and say, well, you're having a senior moment"); Chapman Dep. 49 ("[Eichman] said you got a bunch of old prunellas down there and you need to get rid of some of that, and start to look at some folks that . . . are going to be with us a longer period of time); Chapman Dep. 263 ("Eichman told me, specifically, that I was getting too old, and that I wasn't able to keep up with the work"); Chapman Dep. 342 ("[Eichman] said, 'you look like an old bag of bones.'").  Eichman also allegedly asked Chapman his age at least three times during the weeks leading up to Chapman's termination, including two days before the termination, and when Chapman responded with his age, Eichman would respond with a derogatory comment, such as, "you're just getting too old to continue to do this."  Chapman Dep. 340-42.  In addition, in late August 2011, when Chapman was getting ready to take time off from work for surgery, Eichman told him that he was "a bug under a magnifying lens with senior management," and that senior management was "looking to get rid of [him] in the next 30 to 60 days."  Chapman Dep. 50.

On the morning of Thursday, September 1, 2011, Eichman wrote "an urgent email" to Chapman regarding an assignment related to a Malaysia project that he said was due by 3:00 p.m. the next day.  Chapman Dep. 288-89; Pl. Ex. N.  Chapman was able to complete the assignment by early the next afternoon, and Eichman responded to him after the weekend by saying, "I didn't think you would be able to get that done."  *Id.*

2

The project most relevant to this litigation is Sikorsky's proposal to sell Black Hawk helicopters to the Royal Brunei Air Force, together with after-market support, ground support equipment, logistical support, and training (the "Brunei project"). *Id.* ¶ 5.  Chapman was responsible for the training component of the proposal. *Id.* ¶ 6.  There was some dissatisfaction expressed by Linda Scott, the business acquisition manager for the Brunei project, with Chapman's work; Scott expected items outside the scope of the tender would be included in the work on the project and Chapman believed it would have been unlawful to include these items. 56(a) Stmts. ¶¶ 8, 11-14.

Scott sent the team, including Chapman, an email at 12:28 p.m. on September 22, 2011, detailing deficiencies with the training plan and changes that needed to be made.  Chapman responded, "if the customer is so disappointed, please send us the written documentation of this." Def. Ex. B.  Scott responded that the customer had not provided written documentation, but "was most disappointed in the training." *Id.*  Chapman responded that he found it "very disconcerting and unusual" that the team had been in Brunei all week and that no disappointment had been expressed to him or any other member of the team that he was aware of, and that there was also nothing in writing raising the issues Scott was now bringing up.  Pl. Ex. X.  Chapman then emailed Eichman at 12:54 p. m. to explain that changes Scott was requesting were "out of scope and beyond the contents of the tender."  Pl. Ex. Y; *see also* Lightsey Dep. 45-46 (noting that some of Scott's requested changes would violate Sikorsky's export license agreement).

Eichman took Chapman off the project that afternoon and re-assigned it to Paul Robinson, an employee who had less experience at the company and was seven years younger than Chapman.  Chapman Dep. 97; Robinson Dep. 36-37; Pl. Ex. M., at 3.  After having been taken off the project, Chapman took approved days off from work on Friday, September 23 and

Monday, September 26, 2011.  Chapman Dep. 103, 187, 256.  Even so, Chapman sent an email

on Friday afternoon offering to assist even though he was no longer on the project.  Pl. Ex. AA.

However, he received no communications or information regarding the project until he returned

to work on the morning of Tuesday, September 27, when an email was circulated to the team at

8:50 a.m. indicating that certain updates needed to be made to the training document.  Def. Ex.

C.  At this point, Chapman no longer had access to the underlying data.  Chapman Dep. 99.

Eichman then required Chapman to attend meetings from 9:00 a.m. to approximately 10:45 a.m.

Chapman Dep. 98.

After these meetings concluded, Eichman wrote an email to Chapman at 10:47 a.m.,

instructing Chapman to "[c]onfirm you are working on a response" to the 8:50 a.m. email.

Chapman immediately wrote an email response to Eichman stating: "No, I am not working on

this."  Three minutes later, Eichman replied by email that "I need you to work this."  Chapman,

again immediately, responded, "Sorry.  You benched me.  Not touching this anymore[.]"

Eighty-eight minutes later, Eichman emailed Chapman the following response: "No one was or

has been benched, never the case.  No relief of assignment."  Chapman promptly replied, "Too

bad.  Not working it[.]"  Def. Ex. C.

Eichman re-assigned the task to Robinson and another employee, who working together

and with full access to the underlying data, still had to work for dozens of man-hours to complete

the assignment.  *See* Eichman Dep. 323; Chapman Dep. 107-08.  Chapman left the office around

2:30 p.m. that day for a prescheduled medical appointment for follow-up to his surgery, an

appointment which Eichman had known about.  Chapman Dep. 100-01, 195.

Two days later, on September 29, 2011, Eichman and a Human Resources representative

called Chapman to inform him that he was terminated.  Chapman Dep. 130-31.  They informed

him that he would receive a termination letter the next day via Federal Express.  *Id.*  Chapman did not receive the letter until approximately two weeks later, via U.S. Mail, in an envelope that was already torn open and had a mailing address located across the street from his home. Chapman Dep. 132; Def. Ex. F; Pl. Ex. HH.

At the time of Chapman's termination, Sikorsky's Employee Manual contained a provision stating that "INSUBORDINATION, refusal to do assigned work, failure to carry out a reasonable order, use of obscene or vulgar language, or disrespectful behavior toward a management representative" was a "strictly forbidden" practice and "proper cause for disciplinary action, up to and including dismissal."  Def. Ex. E.  At least two of Chapman's co-workers have at some point told Eichman that they could not do things he asked of them. Lightsey Dep. 174-77.  E. Jan. Lightsey, Training Manager and Integrated Product Team Lead, testified in her deposition that, subsequent to Eichman replacing Chapman as the senior person in the department, Eichman had asked her to do things which she said to him she could not do.  *Id.* at 174.  She testified that she was never directly disciplined for doing so.  *Id.* at 175.  She further testified that when she told Eichman she was not going to do a project that he had asked her to do, she "did not get a writeup" and "was not put on an EIP [Employee Improvement Plan]."  *Id.* at 175-76.  Lightsey also testified that, if Eichman assigned her a project that she is unable to do within the time limit or the strictures Eichman has lain down, it is permissible to tell him that she cannot do the project.  *Id.* at 177.  According to Lightsey, a second employee, Kari Deyo, also told Eichman that she could not do a project he asked her to perform.  *Id.* at 176.

After Chapman's termination, he was replaced by David Scheu, then 42 years of age, and Michael Canady, then 30, who were both younger employees.  *See*, *e.g.*, Eichman Dep. 43-67; Pl. Ex. F ¶ 19.

## STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 172 (2d Cir. 2005).  When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law." *Id.*  Only those facts that must be decided in order to resolve a claim or defense will

prevent summary judgment from being granted.  Immaterial or minor facts will not prevent summary judgment.  *See Howard v. Gleason Corp.*, 901 F. 2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  Furthermore, the Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  However, the inferences drawn in favor of the nonmovant must be supported by evidence.  "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment, *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir. 1997), as is the "mere existence of a scintilla of evidence in support of the [nonmovant's] position," *Liberty Lobby*, 477 U.S. at 252.

## DISCUSSION

### I.     ADEA Claim

The ADEA prohibits workplace discrimination on the basis of age.  *See* 29 U.S.C. §§ 621(b), 623(a).  The Second Circuit has indicated that ADEA claims are analyzed under the same framework as claims brought pursuant to Title VII, *i.e.*, a burden shifting standard under which a plaintiff must first establish a prima facie case of age discrimination, after which the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions, and if the employer articulates such a reason, the plaintiff then has the burden of proving that his age was the real reason for his discharge.  *See Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000).

For purposes of its Motion, Defendant assumes a prima facie case of age discrimination, but by proffering evidence that it terminated Plaintiff for taking vacation days off from work in the face of time-sensitive customer concerns in September 2011 and explicitly refusing to work on the Brunei project upon his return, in spite of his supervisor's instructions, Defendant has shifted the burden to Plaintiff to prove this legitimate, non-discriminatory reason for termination to be pretext.  *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 469 (2d Cir. 2001) ("Once the employer has articulated non-discriminatory reasons for the challenged employment actions, the presumption of discrimination vanishes and the burden shifts back to the plaintiff to come forward with evidence that the employer's proffered explanations were merely pretextual and that the actual motivations more likely than not were discriminatory.").  In order to satisfy his burden at this final stage, Plaintiff must "present[] facts, which taken in his favor, suffice to show that a triable issue exists as to whether his age was a 'but for' cause of his termination," *i.e.*, that "the adverse employment action would not have occurred without it."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168, 169 (2d Cir. 2014) (internal quotation marks and citations omitted).

Plaintiff proffers several pieces of evidence to attempt to establish pretext.  First, he points out that his supervisor, Eichman, gave him permission to take off Friday, September 23 and Monday, September 26, 2011, that he had already been taken off the Brunei project as of September 22, 2011, and that he had turned over all his work related to the project to a younger, less experienced employee (Paul Robinson) at the direction of Eichman.  When he returned to work on Tuesday, September 27, 2011, he was suddenly and unexpectedly tasked by Eichman with fully rewriting the iteration of the report that had been produced by the other employee within six hours, in spite of having not been privy to the developments on the project for the past

8

five days nor having the data the other employee had relied upon in creating the report that he was now tasked with fully rewriting.  When Plaintiff did not perform the task, the assignment was given to Paul Robinson and another employee, who spent substantially more time completing the rewrite than Plaintiff had been given.  *See* Chapman Dep. 107; Eichman Dep. 323.  Plaintiff argues that this indicates that he was being set up to fail with an impossible task that was mere pretext for terminating him because of his age.

Second, Plaintiff was employed at Sikorsky for about five years, during which time he received either exceptional performance or fully competent personnel reviews, including a fully competent review as recently as April 2011.  Chapman Dep. 37, 52.  He had also received tens of thousands of dollars in bonuses, including a performance-based bonus as recently as 2010.  Chapman Dep. 37; Eichman Dep. 74-75.  There was no indication that his employment was in jeopardy until the summer of 2011.  In or about late August 2011, Mr. Eichman told Mr. Chapman that he was "a bug under a magnifying lens right now with senior management," and that "they're looking to get rid of you in the next 30 to 60 days."  Chapman Dep. 50.

Third, Plaintiff notes that his supervisor, Eichman, occasionally made derogatory comments about individuals based on their age.  For example, Plaintiff claims that Eichman on at least five occasions said that Plaintiff was having a "senior moment."  Plaintiff also claims that Eichman referred to him and some other older Sikorsky employees as "old prunellas."  Plaintiff alleges that Eichman said that there was a need to get rid of some of the prunellas "and start to look at some folks that, you know, are going to be with us for a longer period of time."  Chapman Dep. 49:3-4.  Eichman allegedly said that their team had some older members, and that he wanted to replace them with younger people.  Plaintiff claims that Eichman also asked him his age on as many as three occasions, that Eichman said that he was "getting too old" and

therefore "wasn't able to keep up with the work," Chapman Dep. 263:8-10, and that Eichman

said that he looked "like an old bag of bones," Chapman Dep. 342:12-13.

Fourth, Plaintiff alleges that Defendant hired two younger employees, aged 30 and 42, to

replace him.

As Plaintiff acknowledges in his Memorandum of Law in Opposition to Defendant's

Motion for Summary Judgment [Doc. No. 117], "[t]o prove pretext, an age discrimination

plaintiff must do more than simply refute or cast doubt, on the employer's rationale." *Libront v.*

*Columbus McKinnon Corp.*, 832 F. Supp. 597, 628 (W.D.N.Y. 1993).  "The rule that proof of

pretext also requires proof that discrimination was the real reason for an adverse job action has

long been settled in the Second Circuit."  *Fetcho v. Hearst Connecticut Post, LLC*, No. 3:12-cv-

904, 2015 WL 1800111, at *11, 2015 U.S. Dist. LEXIS 50049, at *27 (D. Conn. Apr. 16, 2015).

While "invidious comments about people in the protected age class" and "criticism of an

employee's work performance in age-related degrading terms" can support an inference of age

discrimination, *Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 245 (E.D.N.Y.

2010), such comments only "constitute evidence of discriminatory motivation when a plaintiff

demonstrates that a nexus exists between the allegedly discriminatory statements and a

defendant's decision to discharge the plaintiff," *Pronin v. Raffi Custom Photo Lab., Inc.*, 383 F.

Supp. 2d 628, 636 (S.D.N.Y. 2005).  In determining whether a remark is probative, district

courts in this Circuit generally consider four factors: (1) who made the remark (*i.e.*, a decision

maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the

employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror

could view the remark as discriminatory); and (4) the context in which the remark was made

(*i.e.*, whether it was related to the decision-making process)." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 150 (2d Cir. 2010).

In this case, the alleged remarks were made by Plaintiff's supervisor near in time to Plaintiff's termination and reasonably could be viewed as discriminatory. Significantly, many of the alleged remarks were made in the context of replacing older workers, including Plaintiff, with younger workers, and therefore they could be viewed as related to the decision-making process.

In addition, although the fact that Plaintiff's replacements are substantially younger than him can be seen as a "reliable indicator of age discrimination," *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996), "such evidence alone is not enough on which a reasonable jury could find that [an employer's] nondiscriminatory reason for terminating [a plaintiff's] employment was pretextual," *Farina v. Branford Bd. of Educ.*, 2010 WL 3829160, at *6, 2010 U.S. Dist. LEXIS 99730, at *23 (D. Conn. Sept. 22, 2010) (citing *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 317 (2d Cir. 1999)). However, in combination with the alleged ageist comments of Plaintiff's supervisor, particularly the comments that Defendant needed to replace older employees with younger ones, this fact can help support a finding of pretext.

Even so, the record does not support a reasonable inference that he would not have been fired but for his age. It is undisputed that Plaintiff explicitly defied a direct order from his supervisor in response to two successive emails. *See* Def. Ex. C (Eichman wrote, "I need you to work this"; Chapman responded, "Not touching this anymore"; Eichman then wrote, "No relief of assignment"; and Chapman responded, "Not working it".). It is also undisputed that Sikorsky had in place at the time a clearly-articulated policy that insubordination, refusal to do assigned work, or failure to carry out a reasonable order is "proper cause for disciplinary action, up to and

including dismissal." Def. Ex. E. The plain meaning of the email exchange of September 27,

2011, demonstrates Plaintiff engaged in "strictly forbidden" practices; Plaintiff was terminated

two days later. Based on this set of facts, no reasonable juror could conclude that Plaintiff would

not have been fired but for his age.

Plaintiff points to evidence of two younger employees who were not subjected to

discipline when they informed Eichman that they could not perform assignments that he had

given them. *See* Lightsey Dep. 174-77. The record falls short, however, of providing a factual

basis for inferring that these two employees were similarly situated to Mr. Chapman's repeated

refusals to perform work requested of him. In this Circuit,

> An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct. The standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical. In other words, the comparator must be similarly situated to the plaintiff in all material respects. Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury. To satisfy the all material respects standard for being similarly situated, a plaintiff must show that his co-employees were subject to the same performance evaluation and discipline standards.

*Bryant v. Greater New Haven Transit Dist.*, 8 F. Supp. 3d 115, 130 (D. Conn. 2014) (internal

quotation marks and citations omitted). Here, Plaintiff relies on the testimony of a co-worker, E.

Jan Lightsey, who states that she had told Mr. Eichman that she was "not going to do a project

that he asked [her] to do," Lightsey Dep. at 175-76, and that she suffered no disciplinary

consequences. *Id.* Ms. Lightsey further testified that she was aware of at least one other team

member who was unable to perform a project in the time provided, told Mr. Eichman that she

could not perform it, and also allegedly suffered no disciplinary consequences.

This testimony, however, was vague about the particular circumstances of these

comparators' cases, such as what specific words were exchanged and the degree of their

resistance to Eichman's orders; for example, there is no mention at all about whether either employee's situation involved repeated refusals to do work after persistent requests by Eichman. As a result, there are not enough facts from which a jury could infer that these situations were similar in all material respects to Plaintiff's, much less draw the conclusion that the disciplinary action against Plaintiff was a pretext for discrimination on the basis of his age or, even more pointedly, that but for his age Plaintiff would not have been terminated.  *See Tomasino v. Mount Sinai Med. Ctr. & Hosp.*, No. 97-cv-5252, 2003 WL 1193726, at *14, 2003 U.S. Dist. LEXIS 3766, at *38 (S.D.N.Y. Mar. 13, 2003) ("factual record reveals that [proffered] comparators are not similarly-situated to [plaintiff] in all material respects" because while they "had committed violations similar" to plaintiff's, no evidence that they had "committed the most serious of the infractions for which [plaintiff] was discharged"); *cf. Slatky v. Healthfirst, Inc.*, No. 02-cv-5182, 2003 WL 22705123, at *5-6, 2003 U.S. Dist. LEXIS 20608, at *16-19 (S.D.N.Y. Nov. 17, 2003) (holding minor discrepancies in deposition testimony regarding plaintiff's allegedly insubordinate conduct insufficient to overcome defendant's substantial evidence plaintiff was terminated for that articulated reason).  Accordingly, Plaintiff cannot escape the implication of his unambiguous expression of insubordination that provided his employer a legitimate, non-discriminatory, and non-pretextual basis for terminating him.

Therefore, because Plaintiff cannot establish that he would not have been terminated but for his age, the Court must grant summary judgment with respect to Count One.

## II.    State Law Claims

In addition to his federal law ADEA claims, Plaintiff also brings state law claims for age discrimination under CFEPA, common law invasion of privacy, and common law libel per se.

As one judge in this District recently explained,

> this Court is reluctant to exercise supplemental jurisdiction in non-diversity cases, given that under 28 U.S.C § 1367(c) and (c)(3), United States district courts may decline to exercise supplemental jurisdiction over a claim if they have dismissed all claims over which they had original jurisdiction. Indeed, in recently citing and interpreting 28 U.S.C.A. § 1367(c) and (c)(3), the Second Circuit noted that although federal courts may exercise jurisdiction over related state-law claims where an independent basis of subject-matter jurisdiction exists, such a court may, for various reasons, nonetheless decline to do so. The Second Circuit further explained that such discretion is subject to boundaries, and that if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well.

*Kelly v. Signet Star Re, LLC*, 971 F. Supp. 2d 237, 254 (D. Conn. 2013) (internal quotation marks and citations omitted).

Accordingly, this Court will not evaluate any of Plaintiff's state law claims. *See, e.g.*, *Bellamy v. General Dynamics Corp.*, No. 3:10-cv-1219 (MRK), 2012 WL 1987171, at *7, 2012 U.S. Dist. LEXIS 76890, at *20-21 (D. Conn. June 4, 2012) (questioning whether plaintiff "could effectively state a CFEPA claim on this record," but "leav[ing] this determination to the state courts").

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. No. 93] is GRANTED with respect to Counts One and Three, *i.e.*, the federal ADEA claim.[1] The Clerk is directed to dismiss these Counts with prejudice and without costs.

As for Counts Two, Four, Five, and Six, the Court declines to accept jurisdiction over these state law claims. The Clerk is directed to DISMISS those Counts without prejudice and without costs.

The Clerk is then directed to close the case.

---

[1] The Court need not independently address Count Three of the amended complaint because Plaintiff is no longer asserting claims for hostile work environment independent of his termination from Sikorsky. *See* November 4, 2014 Conference Memorandum and Order [Doc. No. 72], at 1.

SO ORDERED at Bridgeport, Connecticut, this 3rd day of December, 2015.


   /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge